## THE GEORG DUMOIS.

## THE CLARA E. BERGEN.

(Circuit Court of Appeals, Fourth Circuit. May 7, 1907.)

No. 679.

1. COLLISION—CONTRIBUTING FAULTS—ABSENCE OF LOOKOUT.

The absence of a lookout on a vessel, although a fault, is immaterial in fixing liability for a collision, where it clearly was not a contributory cause because the other vessel was seen in ample time, so that with proper navigation on the part of both vessels the collision would not have occurred.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 148.]

2. SAME—STEAM AND SAILING VESSEL—CHANGE OF COURSE BY SAILING VESSEL.

Where a sailing vessel by her unnecessary deviation from her course renders a collision with a steamer unavoidable, the steamer cannot be charged with liability.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 51.]

3. SAME.

A collision at sea in the night between a schooner and a meeting steamer *held* due solely to the fault of the schooner in changing her course after the vessels had seen each other, and the steamer had so changed her course that there was no danger of collision if the schooner held her course.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 51.]

Cross-Appeals from the District Court of the United States for the District of Maryland.

Randolph Barton, proctor for the Georg Dumois.

Robert H. Smith (Harrington Putnam, on brief), for the Clara E. Bergen.

Before GOFF and PRITCHARD, Circuit Judges, and BRAWLEY, District Judge.

GOFF, Circuit Judge. The three-masted schooner Clara E. Bergen, from Staten Island, bound for Charleston, S. C., 145 feet long with 33 feet beam, carrying 103 tons of nitrate of soda, when approaching Hatteras, soon after 1 o'clock a. m. of the night of June 24, 1905, was in collision with the steamer Georg Dumois, 180 feet long by 28 feet beam, with a cargo of fruit from Banes, Cuba, bound for the port of Baltimore. The weather had been thick and misty, when shortly before the collision the sky became overcast, and rain began falling. The fixed lights of Diamond Shoal Lightship first distinctly visible became obscured, but the flash lights were reflected from the sky. After the rain came a squall from the westward. Because of the storm the schooner's light sails were taken in. There is some dispute as to the locality of the collision; the schooner's testimony placing it to the southwestward after she had passed the lightship, while the steamer insists it was to the northward after she had passed the lightship. The schooner coming down the coast sailing on the starboard tack was making about seven knots an hour. The speed of the steamer was between ten and eleven knots an hour, and at the time of the collision she had no lookout forward; her mate and

wheelsman being on her bridge, which was about 64 feet abaft her stem. The schooner, struck on her starboard side, was abandoned; the vessel and her cargo becoming a total loss. The libel of the schooner, filed June 30, 1905, included the loss of her cargo, while the cross-libel, filed February 9, 1906, was for damages to the steamer. The causes were consolidated, the testimony being by deposition, except that the captain of the schooner was examined in open court. The decree below adjudged both vessels at fault, and directed that the damages should be divided. Cross-appeals were sued out.

The testimony for the schooner shows that about a quarter after 1 o'clock a. m. her lookout reported a steamer on the starboard bow, and that the captain and mate duly observed it. The lookout states that the steamer was about three-quarters of a mile from the schooner when the steamer's masthead light was first observed; that after reporting it he went over on the port side, and, seeing nothing there returned to the starboard, when he saw the light closer to the schooner and in the same direction; that the light was so far ahead he did not then think there would be a collision. The mate of the schooner heard the report of the lookout, and thought the steamer was from 600 to 700 feet distant when her mast light was first noticed. He notified the captain that the steamer was right off the weather bow of the schooner. The captain of the schooner heard the reports of the lookout and the mate, answering, "I see her." He recognized it as a steamer's light; says he did not see the steamer until she was two lengths away, but saw the mast light when she was farther distant. He differs with his lookout as to the distance the vessels were from each other when the mast light of the steamer was first reported to him.

The testimony offered by the steamer is to the effect that at 1:15 a. m., when she was under full steam, the schooner was seen on the starboard side of the Georg Dumois, showing the red light, and distant "something around two miles, perhaps closer." The captain and the mate of the steamer observed the schooner about the same time. The wheel of the steamer was ordered to port by the captain, the effect being that the steamer swung to the eastward, bringing her red light to the red light of the schooner and placing the two vessels on parallel lines; that soon after the helm of the steamer had been ported the schooner changed her course, thereby presenting her green light to the steamer; that then the steamer's wheel was put hard aport, and one whistle blown, the schooner still showing her green light, the captain of the steamer rang the engine full speed astern, and between 15 and 20 seconds afterward the collision occurred. At the time of the collision the schooner was sailing about southeast.

The court below in directing the decree appealed from said:

"There are two decisive facts which stand out very strongly. First. That the steamer, when she started to avoid the schooner by porting her helm when the schooner's red light was observed 3½ points on the steamer's starboard bow, either did not put her helm to port sufficiently, or that she did not begin to port at sufficient distance off. This may have been, as seems quite probable from the testimony, because the light she was manœuvring to avoid was not the light on the schooner, but on some vessel more distant and more to the westward, and this may have resulted from having no special lookout on the

steamer, or else the master of the steamer, not having carefully watched the schooner, ran too close to the schooner, closer than was justified by good seamanship in the nighttime and with every opportunity in the open ocean to give her plenty of room. On a steamer going at full speed in a place where vessels were likely to be met on a dark night with squalls of rain obscuring lights, the absence of a lookout properly placed and charged with that sole duty, is sufficient to require the court to resolve doubtful questions of fault against the steamer in a case where the absence of a lookout may reasonably have contributed to the collision. Second. With regard to the schooner, it is clear, I think, that the schooner did not obey the rule requiring her to keep her course. The schooner's master states in his testimony that, when he made out the steamer through the mist and rain, she was very close to the schooner and right on the schooner's starboard bow, and, as he took her to be a steamer whose proper course would probably be north, he, in order to give her more room, put his helm to starboard. There was a strong breeze from the north and west, and, no doubt, the schooner went off rapidly to the eastward, so much so, it would appear, that at the time of the collision she was heading about southeast. This counteracted the porting of the steamer and a collision became inevitable. It is quite clear to my mind that this is a case of mutual fault and the damages should be divided."

The schooner assigned error in the finding that she was guilty of contributory fault in putting her wheel up and changing her course. The steamer assigned it as error that she was adjudged to have insufficiently ported, or not to have ported at the proper time, and that the absence of a lookout might have caused the collision.

The absence of the lookout at the time of and for about an hour immediately preceding the collision is admitted by the steamer. This admission establishes prima facie that the collision was the fault of the steamer. Does the testimony show that, had a lookout been on duty at the time, that the collision would have been prevented? If so, the steamer was at fault; if not, the absence of the lookout was immaterial. In other words, it is well understood that faults which do not cause a collision, or that have not borne directly upon it, are unimportant. The Pilot Boy, 53 C. C. A. 329, 115 Fed. 873; The Farragut, 10 Wall. (U. S.) 334, 19 L. Ed. 946; The Annie Lindsley, 104 U. S. 185, 26 L. Ed. 716; The Blue Jacket, 144 U. S., 371, 12 Sup. Ct. 711, 36 L. Ed. 469.

If the schooner was seen at a distance sufficiently great to have enabled the steamer to pass her in safety, then the collision must have been caused by some fault other than the absence of a lookout. The captain of the steamer says that he saw the·light of the schooner at the distance of "something around two miles, perhaps closer," and that he then ordered the wheel to port; the first mate of the steamer saw the lights of the schooner "about a couple of miles" distant. The man at the wheel saw the lights of the schooner "about 20 minutes" before the collision. One of the crew of the schooner says that after the light of the steamer was reported he saw it for about 12 minutes. The lookout on the schooner says that he saw the white light on the steamer "about three quarters of a mile" away. The captain of the schooner testifies differently from all the other witnesses, contradicts the evidence of the steamer, and differs with his own crew, places the distance the vessels were from each other when the light of the steamer was first seen as not over a quarter of a mile, brings them together in collision starboard side to starboard, when it is quite

evident that they came together the port bow of the steamer striking the starboard side of the schooner. If the evidence of the schooner's captain is correct, that he did not see the steamer's light until it was about one point on his starboard bow, then it was about the time the steamer went hard aport that the lookout of the schooner reported the steamer's light; and that to us in the light of the testimony is inconceivable. We are impelled to the conclusion that the schooner's captain in his effort to establish a satisfactory reason for the change in the course of his vessel—which change he had ordered—saw the lights and estimated the distance quite differently from all others who were on the vessels and subsequently examined as witnesses. If he is correct, the steamer was nearly west of the schooner and about a quarter of a mile distant when he first noticed its mast light. Even then, conceding that to be true, had each vessel maintained its course, there would have been no danger of collision, for the steamer would have gone on northward, and the schooner would have passed to the south on its course W. by S. W. Again, had the vessels occupied that relative position, why should the steamer have ported, and why the schooner have changed its course; for, having due regard for speed, distance, and course, where would the vessels have been after the expiration of the 20 minutes that the man at the wheel of the steamer speaks of, or of the 12 minutes that the member of the crew of the schooner says the light of the steamer was seen, after it was reported and before the collision occurred?

Without further discussion of the testimony, we content ourselves with saying that it clearly shows the officers of the steamer were fully advised of the location of the schooner, and that it was at such a distance as to obviate all danger of collision, had the rules applicable to the situation been observed. Hence the collision must therefore be accounted for in some other way. The presence of the schooner was known, its light was in full view, and action on the steamer's part to keep out of her way was duly taken. We are of the opinion that, although the steamer had no such lookout as was required by law, that fact did not contribute to the collision.

Finding the testimony of the captain of the schooner to be unreliable, and taking the lesser distance given by any of the other witnesses—that of the lookout of the schooner—the vessels were three-quarters of a mile apart when the schooner saw the light of the steamer. He also testifies that the steamer was so far away when he first saw its light that the idea of a collision did not occur to him. It was the duty of the steamer to keep out of the way of the schooner. The steamer ported, presuming that the schooner would keep her course, and the vessels would have safely passed if the schooner had not changed her course. It may be conceded that the red light of the schooner was seen by the steamer before the mast light of the latter was observed by the former, and that the order to port had been given on the steamer before her mast light was seen on the schooner; but still that, under the circumstances, would not have justified the latter in changing her course as she did, thereby rendering ineffective the effort of the steamer to safely pass to the eastward of the schooner. We have presented this point in the light of the testimony of the look-

out of the schooner, which is consistent with the suggestion that he first saw the steamer's mast light after she was aport. Why he did not see it sooner it is difficult to understand, for he testifies that such lights could readily be seen at that time at the distance of one mile. The duties of these vessels were mutual, and the strict observance of the rule was required no more by one than the other. The rule is imperative, and the vessel departing from it is liable for the damages resulting from such departure. As we see this case, the steamer was absolved unless she might have prevented the collision notwithstanding the schooner's error, and this the testimony does not show. Where a sailing vessel by her unnecessary deviation from her course renders a collision with a steamer unavoidable, the steamer should not be charged with damages. The Illinois, 103 U. S. 298, 26 L. Ed. 562.

The Bergen should have kept her course and speed. As a matter of fact she was not in danger of being run down. Her officer erred in concluding that the steamer would not keep out of the way, and that such emergency existed as justified him in taking the action he did. The precaution taken by the steamer would have been effective had not the schooner changed her course. The steamer was not at fault. The schooner was. The decree appealed from should be accordingly so modified.

Remanded, with directions to enter a decree in accordance with the views herein expressed.

Decree modified.